IN THE UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BERNARD A. HOUSE, JR., | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | CIVIL NO. 3:12-CV-02358 |
| | : | |
| CAROLYN W. COLVIN, ACTING | : | (Judge Kane) |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant | : | |

**MEMORANDUM**

Plaintiff Bernard A. House, Jr. has filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying House's claim for supplemental security income benefits. (Doc. No. 1).

I. **BACKGROUND**

House protectively filed his application for supplemental security income benefits on April 23, 2009, claiming that he became disabled on October 8, 1994. Tr. 245, 256. House has been diagnosed with several impairments, including "arthritis status post left ankle fracture," lumbar vertebrae compression fracture, and lumbosacral radiculitis. Tr. 15, 19. On August 11, 2009, House's application was initially denied by the Bureau of Disability Determination. Tr. 57.

On August 28, 2009, House requested a hearing before an administrative law judge ("ALJ"). Tr. 62. The ALJ conducted a hearing on August 26, 2011, where House was represented by counsel. Tr. 32-52. On September 9, 2011, the ALJ issued a decision denying House's application. Tr. 13-24. On September 4, 2012, the Appeals Council declined to grant review. Tr. 2. House filed a complaint before this Court on November 26, 2012. (Doc. No. 1). Supporting and opposing briefs were submitted and this case became ripe for disposition on April 23, 2013, when House filed a reply brief. (Doc. Nos. 10, 11, 12).

House appeals the ALJ's determination on four grounds: (1) the ALJ failed to properly develop the record, (2) the ALJ's residual functional capacity determination was unsupported by substantial evidence, (3) the ALJ's credibility determination was unsupported by substantial evidence, and (4) the ALJ's determination at step five of the sequential evaluation process was not supported by substantial evidence. For the reasons set forth below, this case is remanded to the Commissioner for further proceedings.

II.     **Statement of Relevant Facts**

House is 33 years of age, has an eighth grade education, and is able to read, write, speak, and understand the English language. Tr. 40, 49-49, 268. House does not have any past relevant work. Tr. 23, 47.

    A.     **Medical Evidence**

House's medical history began on October 7, 1994 when he was involved in a motor vehicle accident. Tr. 417. House was sleeping in a tractor trailer when the vehicle went off the road; he was ejected from the vehicle. Id. At the hospital, House was diagnosed with compound fractures of the L1 and L2 vertebrae and a Salter IV fracture of the left ankle. Tr. 412-13. The fracture in House's ankle ran "through the distal tibial metaphysis [and] extend[ed] through the growth plate into the epiphyseal ossification center." Tr. 413. Michael Ries, M.D. performed open reduction and internal fixation surgery on House's left ankle; House tolerated the procedure well and no complications arose. Tr. 415-16, 425. House was fitted with a Boston brace to help his fractured vertebrae heal and was discharged from the hospital on October 13, 1994. Tr. 425-26.

Dr. Ries examined House twelve days later and determined that his wounds were "well healed." Tr. 387. X-rays revealed "satisfactory position of both" the ankle and lumbar fractures. Id. X-rays taken on November 16, 1994 revealed evidence of healing in the left ankle, although the lumbar fractures were unchanged. Tr. 386. At a follow-up examination on December 28, 1994, Dr. Ries noted that new x-rays of the left ankle were "suggestive of partial growth plate closure." Tr. 383. However, he noted that House's ankle and lumbar fractures were healing, and House had "no complaints." Id. Dr. Ries recommended that

3

House discontinue the use of crutches, but avoid sports or gym participation for two months.  Id.

On March 1, 1995, House returned to Dr. Ries for another follow-up appointment.  Tr. 380.  An MRI of House's left ankle revealed that "the medial half to one-third of the epiphyseal plate anteriorly [was] markedly disrupted . . ."  Tr. 382.  House had a ten degree range of motion in his left ankle dorsiflexion and a thirty degree range of motion in his left ankle plantar flexion.  Tr. 380.  Dr. Ries believed that surgical intervention may be needed due to House's growth plate closure and referred him to Joseph Dutkowsky, M.D.  Id.

On March 10, 1995, House presented to Dr. Dutkowsky for a surgical evaluation.  Tr. 377.  At this appointment, House demonstrated "good ankle range of motion without pain," had a well-aligned ankle, and intact distal neurovasculature.  Id.  Dr. Dutkowsky concluded that House had developed a distal tibial epiphyseal bar involving "approximately 30% of the growth bar."  Id.  Dr. Dutkowsky opined that, as a result of this bar, House would "clearly develop a progressive deformity at the ankle is nothing is done . . ."  Id.  House agreed to have this epiphyseal bar surgically removed.  Id.

On March 14, 1995, Dr. Dutkowsky performed medial distal tibial epiphyseal bar excision surgery on House.  Tr. 368-69.  On April 14, 1995, Dr. Dutkowsky noted that House's wound had "beautifully healed" and there was "no

4

clear remaining growth arrest." Tr. 364.  X-rays did not reveal recurrent bar formation.  Tr. 365.  Dr. Dutkowsky recommended that House continue the use of crutches, with "touch down weight-bearing only."  Tr. 364.  On May 12, 1995, Dr. Dutkowsky opined that House was doing extremely well, although x-rays revealed only minimal healing since April.  Tr. 362-63.  On June 9, 1995, Dr. Dutkowsky removed House's cast; x-rays revealed that the growth plate remained open, and there was no epiphyseal bar reformation.  Tr. 361.

On September 15, 1995, House presented to Dr. Dutkowsky for a six months follow-up examination.  Tr. 359.  Dr. Dutkowsky wrote that House had been fully active and had played soccer and been skateboarding "without significant problems."  Id.  House walked with a normal gait, showed no ankle deformity, and had intact distal neurovasculature.  Id.  X-rays of House's left ankle revealed no recurrence of the epiphyseal bar and showed an open growth plate.  Id.  Dr. Dutkowsky opined that House's was "growing well" and he could continue his normal activities.  Id.

On March 15, 1996, House presented for his final follow-up appointment with Dr. Dutkowsky.  Tr. 358.  An x-ray revealed that the distal tibial epiphyseal plate still appeared open, although there was "some deformity of the distal tibial metaphysis."  Tr. 357.  Despite these findings, a physical examination of House's left ankle revealed "no deformity" and no tenderness.  Tr. 358.  Dr. Dutkowsky

concluded that he was "very pleased" with House's progress, and recommend that House return to the hospital only on an as-needed basis. Id.

On October 31, 1997, House presented to David Cooper, M.D. for an evaluation of his orthopedic injuries. Tr. 429. House complained of mid and lower back soreness after activities such as soccer and volleyball; he also complained that "his left ankle hurt on a regular basis after activities, and . . . the left leg [felt] a little weaker." Id. House stated that he took aspirin for his soreness and was "living with it." Id. Dr. Cooper conducted a physical examination and found that House had a full range of motion in his back, although he did complain of pain "at the extremes of flexion." Tr. 430. There was also a "slight amount" of muscle spasm present in the mid-back area. Id. Dr. Cooper noted "some residual fibrosis and scar tissue" in the soft tissues in House's mid-back, and opined that this "certainly could account for [House's] subjective complaints of pain." Id.

Dr. Cooper noted that House's left calf was "significantly" smaller than the right calf. Tr. 430, 432. Dr. Cooper also found increased crepitation in the left ankle that was indicative of underlying fibrosis and degenerative changes, although Dr. Cooper did not observe any deformity in the left ankle. Tr. 430. House had a ten degree range of motion in his left ankle dorsiflexion, but had a full range of motion in his left ankle plantar flexion.[1] Id. There was no evidence of entrapment

---

[1] A full range of motion in the ankle plantar flexion is forty degrees. Tr. 319.

or subluxation of the peroneal or tibial tendons, and no other issues were noted with House's left ankle. Tr. 430-31.

Dr. Cooper stated that House's lumbar fractures had "healed uneventfully," and the ankle surgery had been successful in "reducing the potential for any growth abnormalities." Tr. 431. Dr. Cooper opined that the scar tissue and fibrosis in House's mid-back area could be "expected to cause [House] some soreness and discomfort" on a permanent basis. Tr. 432. Dr. Cooper also believed that House was suffering from "early traumatic arthritis" in his left ankle, and noted that House's "significantly" smaller left calf indicated there was "some degree of pain and disability" in the left ankle. Id. Dr. Cooper also believed that House was downplaying the severity of his symptoms. Tr. 433. Dr. Cooper concluded that House had a guarded prognosis and that "additional surgery on the left ankle [was] a strong possibility, including arthroscopic fusion" in the future. Tr. 432-33.

House's next medical appointment occurred approximately twelve years later when he presented to P.K. Patel, M.D. on April 10, 2009. Tr. 439. House complained of low back and left ankle pain, as well as arthritis in his left wrist and left ankle. Id. Dr. Patel diagnosed House with lumbosacral radiculitis, a left ankle fracture, and a lumbar spine fracture.[2] Id. Dr. Patel opined that House was "totally

---

[2] Dr. Patel offered two other diagnoses, however, both are illegible.

disabled." Id. That same day, Dr. Patel completed a Department of Public Welfare form and opined that House was permanently disabled. Tr. 440.

House returned to Dr. Patel on May 29, 2009, again complaining of lower back and left ankle pain. Tr. 438. House complained that his left ankle was swelling and "turns inward." Id. Dr. Patel prescribed Naproxen to ease House's pain. Id. House again presented to Dr. Patel on July 6, 2009; he was still experiencing lower back and left ankle pain. Tr. 437. House's mother and girlfriend were both concerned that Naproxen was "not working." Id. On September 17, 2009, House complained that medications were not helping with his pain. Tr. 436.

On January 14, 2010, House again presented to Dr. Patel. Tr. 435. House complained of back and ankle pain, but did not have any new problems. Id. He also noted at this appointment that his "meds help some." Id. House's final check-up with Dr. Patel occurred on June 24, 2010, where he complained of a sore back. Tr. 443. Dr. Patel reiterated his diagnoses of lumbosacral radiculitis.[3] Id.

### B. Residual Functional Capacity Assessment

Dr. Mizin was the only doctor of record who offered a residual functional capacity assessment. Tr. 316-17. Dr. Mizin opined that House could only occasionally lift or carry up to ten pounds. Tr. 316. He also believed that House

---

[3] Dr. Patel consistently repeated his diagnoses of lumbosacral radiculitis, lumbar spine fracture, and left ankle fracture. Tr. 435-43.

8

could walk and stand for less than one hour in an eight hour workday, and could only sit for half an hour.  Id.  Dr. Mizin stated that House could only occasionally bend, and noted that House required the use of eye glasses.  Tr. 317.  Otherwise Dr. Mizin did not believe that House was limited in any way.  Tr. 316-17.

Accompanying this residual functional capacity assessment was a chart detailing House's range of motion (ROM) throughout his body.  Tr. 318-19.  Dr. Mizin found that House had a significantly reduced ROM in his lumbar spine.  Tr. 319.  House's lumbar flexion-extension ROM was reduced by half to forty-five degrees, and his lumbar lateral flexion ROM was reduced by half to ten degrees bilaterally.  Id.  House's ROM in his left ankle was also reduced by half; his dorsi-flexion ROM was ten degrees, while his plantar-flexion ROM was twenty degrees.  Id. Otherwise, House's ROM throughout his body was intact.  Tr. 318-19.

Timothy Specht, a non-physician state agency adjudicator also offered a residual functional capacity assessment.  Tr. 325-30.  Mr. Specht believed that House could occasionally lift and/or carry up to fifty pounds, and could frequently lift and/or carry up to twenty-five pounds.  Tr. 325.  Otherwise, it was Mr. Specht's belief that House was not limited in any way.  Tr. 325-30.

### C. The Administrative Hearing

On August 26, 2011, House's administrative hearing was conducted.  Tr. 32-52.  At that hearing, House testified that he was unable to sit or stand for long

periods of time and he moved "quite a bit slower because of the pain." Tr. 35. House was able to sit for one "half hour at the most" at one time, and could sit for a "couple [of] hours" total during an eight hour day. Tr. 38-39. He also testified that he could stand between one to two hours per day. Tr. 39. House stated that his pain resulted from arthritis in his back and left ankle; the pain occurred daily and was exacerbated by repetitive movement throughout the day. Tr. 36, 39-40. House also experienced daily swelling of his ankle. Tr. 36. As a result, House moved his bedroom to the downstairs level, installed handicapped bars in the bathroom, and tried to keep his feet elevated during the day. Id.

House explained that he stopped receiving medical treatment during the 1990's because his condition had improved after the initial surgeries. Tr. 45. However, House testified that sometime around 1996 or 1997 he reinjured his back in a sledding accident; after this accident his condition began worsening. Tr. 45-46. House also stated that, after reinjuring his back, he received sporadic treatment for his impairments because he lost Medicaid coverage and had been taken off of "a sliding scale fee" at his hospital. Tr. 51. Consequently, he was frequently unable to pay for hospital care. Id.

House further testified that, to deal with his pain, he use heating pads, took Naproxen and Tylenol arthritis, and did "anything with [his] hands to keep [himself] distracted" from the pain. Tr. 37-38. House testified that more powerful

pain medications, such as Morphine, had been recommended; however, House refused these medications because he was worried about their addictive nature. Tr. 42. House stated that he was mostly unable to perform any household chores; his wife, parents, and brother had to perform most household chores. Tr. 39. House could bathe himself and perform the majority of his own personal care but, with the exception of microwavable meals, was unable to cook his own meals. Tr. 46.

After House testified, Alina Kurtanich,[4] an impartial vocational expert, was called to give testimony. Tr. 47. The ALJ asked Ms. Kurtanich to assume a hypothetical individual with House's age, education, and work experience that was limited to sedentary work[5] but must be able to sit or stand at will. Tr. 48. The hypothetical individual could not climb stairs, and could not work in a production rate or pace of work. Id.

Ms. Kurtanich opined that this hypothetical individual would be able to perform three jobs that exist in significant numbers in the national economy: a surveillance system monitor, a document preparer, and a ticket taker. Id. On cross-examination, Ms. Kurtanich testified that, if an individual were limited to

---

[4] The administrative hearing transcript refers to the vocational expert as "Ms. Kirtanick." Tr. 47. However, her résumé spells her name as Kurtanich. Tr. 203.
[5] Sedentary Work is defined by the regulations of the Social Security Administration as work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967.

sitting no longer than two hours per day and standing and walking for no more than two hours per day, that individual would not be able to work on a full-time basis. Tr. 50. Furthermore, if the individual were off task for twenty percent of the day, she or he would be unemployable. Id.

III.  **Discussion**

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision denying a plaintiff's claim for disability benefits, the district court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence. Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 (3d Cir. 2008). Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims. See 20 C.F.R. § 404.1520; Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 91-92 (3d Cir. 2007). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work, and (5) if not, whether he or she can perform other work in the national economy. See 20 C.F.R. § 404.1520. The

13

initial burden to prove disability and inability to engage in past relevant work rests on the claimant; if the claimant meets this burden, the burden then shifts to the Commissioner to show that a job or jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Mason, 994 F.2d at 1064.

### A. Available Medical Evidence

House argues, inter alia, that the ALJ erred in reaching his residual functional capacity determination. Specifically, House contends that the ALJ improperly accorded greater weight to the opinions of Drs. Dutowsky, Ries, and Cooper than to the opinions of Drs. Patel and Mizin. The ALJ decided that the opinions of Drs. Dutowsky, Ries, and Cooper were entitled to great weight, while the opinions of Drs. Patel and Mizin were only accorded "probative weight."[6] Tr. 22.

The opinions of opinions of Drs. Dutowsky, Ries, and Cooper were all substantially outdated and could not be relied upon to assess House's physical impairments over one decade later. Dr. Cooper's opinion, given nearly twelve years prior to House's application, notes that House would likely suffer permanent back pain, and that House was experiencing "early traumatic arthritis." Tr. 432. Dr. Cooper opined that future surgery was "a strong possibility" and that House's

---

[6] The ALJ did not clarify what "probative weight" means.

ankle would likely need to be fused together at a future date.  Tr. 432-33.  Additionally, Dr. Cooper was careful in his report not to exclude the possibility of future growth abnormalities or deformity in House's left ankle.  Tr. 431, 432.  This strongly indicates that Dr. Cooper believed House's ankle impairment would progressively degenerate.

    Dr. Mizin's findings support a conclusion that House's ankle condition was indeed degenerative.  Dr. Mizin's 2009 examination revealed that House's left ankle plantar-flexion ROM was reduced by half.  Tr. 319.  This finding is in sharp contrast to Dr. Cooper's findings in 1997, when House had a full left ankle plantar-flexion ROM.  Tr. 430.  Medical records also indicate that there may have been some degeneration in House's lumbar spine impairment.  In 1997, Dr. Cooper found that House had a full lumbar ROM, with some pain at the "extremes of flexion."  Tr. 430.  In contrast, by 2009 Dr. Mizin found that House's lumbar ROM was reduced by half in both the flexion-extension and lateral flexion tests.  Tr. 319.  Dr. Patel also diagnosed House with lumbosacral radiculitis, further supporting a conclusion that House's lumbar condition had deteriorated.  Tr. 435-40.

    House's physical degeneration rendered the opinions of Dr. Dutkowsky, Dr. Ries, and Dr. Cooper, all twelve to fourteen years old at the time of House's application, substantially outdated.  Consequently, the ALJ's decision to give great weight to those opinions was not supported by substantial evidence.  E.g., Alley v.

Astrue, 862 F.Supp. 2d 352, 366 (D. Del. 2012); Gaffney v. Colvin, Civ.A. 12-714, 2013 WL 967656, at *8 (W.D. Pa. Mar. 11, 2013). The outdated nature of these medical reports and opinions created an additional problem; the ALJ rejected a treating physician's opinion without any contradictory evidence.

The preference for the treating physician's opinion has been recognized by the United States Court of Appeals for the Third Circuit and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). In choosing to reject the evaluation of a treating physician, an administrative law judge may not make speculative inferences from medical reports and may reject treating physician's opinions outright only on the basis of contradictory medical evidence. Id. at 317 (quoting Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir.1999)). An administrative law judge may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation or lay opinion. Id.

With respect to House's medical condition after the date he filed for benefits, no evidence whatsoever contradicted Dr. Patel's findings and opinions. While the ALJ found that Dr. Patel's opinion was not "entirely consistent" with the record as a whole, it was consistent with the only other relevant and timely medical opinion, that of Dr. Mizin. Tr. 22. Dr. Patel opined that House was "totally disabled." Tr. 439. Dr. Mizin opined that House could walk or stand for less than

one hour per day and sit for only thirty minutes per day, thereby effectively rendering House disabled.  Tr. 316.  Dr. Mizin's conclusion was also consistent with Dr. Patel's diagnosis of lumbosacral radiculitis.  Tr. 19.  As there was no relevant medical evidence contradicting Dr. Patel's opinion, the ALJ erred in rejecting Dr. Patel's opinion.  See, e.g., Gaffney v. Colvin, Civ.A. 12-714, 2013 WL 967656, at *7 (W.D. Pa. Mar. 11, 2013).

    **B.**    **Residual Functional Capacity Assessment**

The ALJ's residual functional capacity determination at step four of the sequential evaluation process was also flawed.  The ALJ's decision to reject Dr. Mizin's assessment forced the ALJ to reach a determination without the benefit of any medical opinion to support that determination.

A residual functional capacity assessment must be based on a consideration of all the evidence in the record, including the testimony of the claimant regarding her activities of daily living, medical records, lay evidence and evidence of pain.  See, Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121-22 (3d Cir. 2000).  Rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant.  See, Doak v. Heckler, 790 F.2d 26, 29 (3d Cir.1986) ("No physician suggested that the activity [the claimant] could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could

17

is not supported by substantial evidence."); see also, Maellaro v. Colvin, 3:12-CV-01560, 2014 WL 2770717, at *11 (M.D. Pa. June 18, 2014); Arnold v. Colvin, 3:12-CV-02417, 2014 WL 940205, at *4 (M.D. Pa. Mar. 11, 2014); Gormont v. Astrue, 3:11-CV-02145, 2013 WL 791455, at *7 (M.D. Pa. Mar. 4, 2013); Troshak v. Astrue, 4:11-CV-00872, 2012 WL 4472024, at *7 (M.D. Pa. Sept. 26, 2012).

The ALJ's decision to discredit, at least partially, the opinions of both Dr. Patel and Dr. Mizin left the ALJ without a single medical opinion[7] upon which to base his residual functional capacity determination. For example, Dr. Mizin concluded that House could only sit for thirty minutes in an eight hour workday, and could only walk or stand for less than one hour per day. Tr. 316. Without any medical opinion contradicting Dr. Mizin's opinion, the ALJ relied on his own lay intuition in concluding that House was essentially unlimited in his ability to sit and

---

[7] Mr. Specht, a state agency adjudicator, also completed a residual functional capacity assessment. Tr. 325-30. An ALJ may not rely upon such forms in reaching a residual functional capacity determination. E.g., Wise v. Astrue, 4:11-CV-01253, 2012 WL 4484944, at *2 (M.D. Pa. January 31, 2012); Rich v. Colvin, 3:11-CV-01778, 2013 WL 1826370, at *7 (M.D. Pa. Apr. 29, 2013); Root v. Colvin, 1:13-CV-00655, 2014 WL 1293833, at *19 (M.D. Pa. Mar. 31, 2014). See also, Letter from Frank A. Cristaudo, Chief Administrative Law Judge to Regional Chief Administrative Law Judges re: Evaluation of Single Decisionmaker Residual Functional Capacity Assessments—Reminder, May 19, 2010 (A state agency adjudicator's opinion is "not opinion evidence at the appeals levels. Thus, agency policy requires ALJs . . . to evaluate [these] RFC assessments as adjudicatory documents only, and not accord them any evidentiary weight when deciding cases at the hearing level.").

stand or walk; this was improper.[8]  Consequently, the ALJ's residual functional capacity determination was not supported by substantial evidence.

Furthermore, without an adequate residual functional capacity determination to rely on, the hypothetical questions presented to the vocational expert were flawed and the vocational expert's testimony cannot constitute substantial evidence.  See, Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002) (quoting Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir.1987)) ("A hypothetical question posed to a vocational expert must reflect *all* of a claimant's impairments.") (emphasis in original).  Therefore, the ALJ's determination at step five of the evaluation process was not supported by substantial evidence.

**Conclusion**

A review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence.  Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is vacated, and this case is remanded for further proceedings.

---

[8] As two commentators have explained: "Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination based on those administrative definitions and is reserved to the Commissioner. However, the underlying determination is a medical determination, i.e., that the claimant can lift five, 20, 50, or 100 pounds, and can stand for 30 minutes, two hours, six hours, or eight hours. That determination must be made by a doctor. Once the doctor has determined how long the claimant can sit, stand or walk, and how much weight the claimant can lift and carry, then the ALJ, with the aid of a vocational expert if necessary, can translate that medical determination into a residual functional capacity determination . . . Thus, while agency regulations provide the ultimate issues such as disability and RFC are reserved to the agency, it may not reject a physician's medical findings that determine the various components and requirements of RFC." Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability Law and Procedure in Federal Courts, 344–45 (2014).

An order consistent with this memorandum follows.

BY THE COURT:

s/Yvette Kane
Yvette Kane
United States District Judge

Dated: August 6, 2014